**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, ) | CR-05-0099-02-PHX-MHM |
| ) | |
| Plaintiff, ) | **ORDER** |
| ) | |
| vs. ) | |
| ) | |
| Anthony Fabela, ) | |
| ) | |
| Defendant. ) | |
| ) | |

Currently pending before the Court is the United States of America's request for an Order pursuant to United States v. Sell, 539 U.S. 166 (2003). After reviewing the Parties pleadings and conducting an evidentiary hearing, the Court issues the following Order.

**I.   BACKGROUND**

This is a criminal case in which Defendant, Anthony Fabela, has been indicted on thirteen counts. These counts include: Conspiracy to Commit Murder and Aid and Abet (Count 1); Conspiracy to Commit Aggravated Assault and Aid and Abet (Count 2); Conspiracy to Commit Kidnaping and Aid and Abet (Count 3); Kidnaping and Aid and Abet (Count 4); Use of a Firearm in a Crime of Violence (Count 5); Kidnaping and Aid and Abet (Count 6); Use of a Firearm in a Crime of Violence (Count 7); Attempted Murder and Aid and Abet (Count 8); Use of a Firearm in a Crime of Violence (Count 9); Assault Resulting in Serious Bodily Injury and Aid and Abet (Count 10); Use of a Firearm in a Crime of

Violence (Count 11); Assault with a Dangerous Weapon and Aid and Abet (Count 12); Use of a Firearm in a Crime of Violence (Count 13).

On November 17, 2005, the Court found that Defendant was not competent to stand trial and ordered him into the custody of the Attorney General. Thereafter, in December 2005, Defendant was placed in the Federal Medical Center at Butner, North Carolina for further mental evaluation, including an assessment of how long it might take to restore defendant's competency.

On May 2, 2007, this Court Ordered that Defendant be provided with an administrative hearing pursuant to Washington v. Harper, 494 U.S. 210 (1990) and 28 C.F.R. 549.43 to determine whether involuntary medication was appropriate. Under Harper and its companion regulations promulgated by the Bureau of Prisons (BOP), involuntary medication is permitted in limited circumstances for inmates who are (1) gravely disabled or (2) represent a significant danger to themselves or others in the context of a prison. On July 17, 2007, after conducting the appropriate administrative hearing, the Federal Medical Center reported that involuntary medication pursuant to Harper was not appropriate on the facts presented. On December 3, 2007, defendant agreed to return to the Federal Medical Center for the purpose of receiving voluntary administration of medication for competency restoration. On May 7, 2008, the Federal Medical Center submitted a report indicating that defendant was not in compliance with the necessary medical treatment for voluntary competency restoration.

Thereafter, the Federal Medical Center requested that Defendant be involuntarily medicated pursuant to United States v. Sell, 539 U.S. 166 (2003). On July 9, 2008, this court ordered a Sell hearing. This hearing was held before the Court on December 17, 2008, where Dr. Dr. Robert G. Lucking testified for the government and Dr. Richard J. Rosengard testified for the defense.

///

## II. APPLICABLE LAW

The Supreme Court has on numerous occasions reaffirmed the principle that under the Due Process Clause of the 5th and 14th Amendments individuals enjoy a "liberty interest in freedom from unwanted antipsychotic drugs." United States v. Williams, 356 F.3d 1045, 1053 (9th Cir. 2004) (quoting Riggins v. Nevada, 504 U.S. 127, 137(1992)). However, in United States v. Sell, the Supreme Court recognized that "the Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial, but only if the treatment is medically appropriate." Sell, 539 U.S. at 180. Accordingly, Sell sets forth the conditions under which a court may allow involuntary administration of medications to restore competency when involuntary medication pursuant to Harper is found to be inappropriate. Sell, 539 U.S. at 179-80. The conditions are as follows:

First, the Court must determine that "important governmental interests are at stake." Id. at 180.

> The Government's interest in bringing to trial an individual accused of a serious crime is important. That is so whether the offense is a serious crime against the person or a serious crime against property. In both instances the Government seeks to protect through application of the criminal law the basic need for security.
>
> Courts, however, must consider the facts of the individual case in evaluating the Government's interest in prosecution. Special circumstances may lessen the importance of that interest. . . . The potential for future [civil] confinement affects, but does not totally undermine, the strength of the need for prosecution. The same is true of the possibility that the defendant has already been confined for a significant amount of time (for which he would receive credit toward any sentence ultimately imposed, see 18 U.S.C. § 3585(b)). Moreover, the Government has a concomitant, constitutionally essential interest in assuring that the defendant's trial is a fair one.

Id. (internal citations omitted).

Second, the Court must determine that "involuntary medication will significantly further those concomitant state interests." Id. at 181. "Specifically, the court must find that the administration of the drugs is substantially likely to render the defendant competent to stand trial and substantially unlikely to have side effects that will interfere significantly with

the defendant's ability to assist counsel in conducting a trial defense." United States v. Hernandez-Vasquez, 513 F.3d 908, 913 (9th Cir. 2008) (quoting Sell, 539 U.S. at 179-80).

Third, the Court must find that "involuntary medication is necessary to further those interests." Sell, 539 U.S. at 180. "It must be shown that any alternative, less intrusive methods are unlikely to achieve substantially the same results; and the court must consider less intrusive means for administering the drugs, such as a court order "backed by the contempt power." Id.

Under the final fourth factor, the court must determine that the "administration of the drugs is medically appropriate, i.e., in the patient's best medical interest in light of his medical condition." Id.

The Ninth Circuit has stated that Sell Orders which permit the involuntary medication of an accused to restore competency are "disfavored," and that relevant case law demonstrates the Ninth Circuit's "reluctance to permit involuntary medication except in rare circumstances." United States v. Rivera-Guerrero, 426 F.3d 1130, 1135 (9th Cir. 2005). The Ninth Circuit has stated that any valid Sell order must at a minimum contain the following:

> a Sell order must provide at least some limitations on the medications that may be administered and the maximum dosages and duration of treatment. At a minimum, to pass muster under Sell, the district court's order must identify: (1) the specific medication or range of medications that the treating physicians are permitted to use in their treatment of the defendant, (2) the maximum dosages that may be administered, and (3) the duration of time that involuntary treatment of the defendant may continue before the treating physicians are required to report back to the court on the defendant's mental condition and progress. We stress that while the court may not simply delegate unrestricted authority to physicians, the restrictions it does impose should be broad enough to give physicians a reasonable degree of flexibility in responding to changes in the defendant's condition. Moreover, the Government or the defendant may move to alter the court's order as the circumstances change and more becomes known about the defendant's response to the medication.

Hernandez-Vasquez, 513 F.3d at 918.

## III. ANALYSIS UNDER THE SELL FACTORS

### A. Important Governmental Interests Are At Stake

With respect to the first factor, the government alleges that the facts of the crime speak to the seriousness of the allegations against Defendant. Here, Mr. Fabela is

charged with several crimes concerning the kidnaping and attempted murder of two juvenile males on the Gila River Indian Reservation. The crimes implicate an alleged mob of at least six men who kidnaped and beat the victims for several hours. During the course of the attack, it is alleged that both juveniles were shot in the head and left to die. The United States also notes that the co-defendants in this matter all pled guilty to dangerous and violent felonies and received harsh prison sentences. The sentences of Mr. Fabela's co-defendants are as follows: Roberto Fabela pled guilty to Attempted Murder and Use of a Firearm in a Crime of Violence and was sentenced to 20 years in prison; Lorenzo Lizarraga pled guilty to Assault Resulting in Serious Bodily Injury and Use of a Firearm in a Crime of Violence and was sentenced to 15 years in prison; Mitchell Jack, Jr. pled guilty to Discharge of a Firearm in a Crime of Violence and was sentenced to 10 years in prison[1]; Scott Kelley and David Moroyoque pled guilty to Use of a Firearm in a Crime of Violence and were sentenced to 7 years in prison.

The United States argues that while Defendant was not a shooter, his responsibility is comparable to that of Roberto Fabela and Lorenzo Lizarraga. The United States further contends that under relevant sentencing laws, if convicted, Defendant faces a mandatory minimum of 10 years on the first 924(c) conviction and consecutive minimums of 25 years on subsequent counts[2]; in the alternative, the absolute minimum that defendant could face for the 924(c) charges is 35 years. When weighed against the fact that Defendant has been in custody since March 2005, less than five years, the United States argues that important government interests are at stake in brining Defendant to trial.

---

[1] Mitchell Jack, Jr. received a more lenient sentence due to cooperation with the government

[2] At the same time, the United States acknowledges that case law might suggest that the because there are only two victims, only two sentences for 924(c) can be imposed; however, the government believes there is a sufficient legal argument that would justify consecutive counts for all five charges.

- 5 -

1    Defendant has responded by arguing that under the first <u>Sell</u> factor the Court must be guided by the Ninth Circuit's pronouncement in <u>Hernandez-Vasquez</u>, that "courts must consider facts of individual cases in evaluating the government's interest in prosecution." <u>Hernandez-Vasquez</u>, 513 F.3d at 917-18. Under this reasoning, Defendant's claims the Court should take into account the fact that he faces the possibility of an unspecified civil commitment in the event the Court does not issue a <u>Sell</u> Order. According to Defendant, if his potential civil commitment is likely to mirror the anticipated term of incarceration if convicted, then the cost, trouble and inconvenience of restoring his competence via forced medication only for trial purposes is somewhat senseless, in light of the other medical risks and uncertainties involved.

The Court notes that both sides have presented compelling arguments on this first factor, and the issue of the nature of the government's interest in bringing Defendant to trial appears to be a close call. Certainly, the United States is justified in attempting to seek full resolution of a criminal matter where the defendant has been accused of taking part in an exceptionally violent and brutal crime. At the same time, counsel for the United States has on more than one occasion informed this Court that it would be seeking to civilly commit Defendant for the remainder of his life, should the <u>Sell</u> matter be resolved to the government's dissatisfaction. The Court would also be remiss if it did not note that, given Defendant's psychological profile, there is strong likelihood that any attempt to seek civil commitment will prove successful. The high probability that Defendant will face an indeterminate period of civil commitment slightly undercuts the government's interest in bringing Defendant to trial. Nevertheless, the first factor weighs in favor of the United States, and the Court finds that important government interests are at stake here.

**B. Administration Of The Drugs Is Substantially Likely To Render Defendant Competent To Stand Trial And Is Substantially Unlikely To Have Side Effects That Will Interfere Significantly With Defendant's Ability To Assist Counsel In Conducting A Trial Defense**

The government has set forth a proposed treatment plan for Defendant that it argues is substantially likely to render him competent to stand trial.[3] The government claims that its proposed treatment plan is unlikely to cause side effects that will interfere with Defendant's ability to help and assist his counsel during trial. The government's proposed treatment plan, which was developed by its expert, Dr. Lucking, calls for the administration of a first-generation antipsychotic medication specifically, injectable Haloperidol (also known as Haldol).

According to Dr. Lucking, treatment with Haldol often produces beneficial clinical results such as decreasing auditory hallucinations, decreasing delusional beliefs and paranoia. At the evidentiary hearing, Dr. Lucking testified that "70% of first-episode patients receive remission of psychotic signs and symptoms within three to four months" and "83% achieve stable remission at the end of one year." Dr. Lucking also claimed that even a partial response to antipsychotic medication can result in a restoration of competency for purposes of being able to stand trial. By utilizing the government's treatment plan, Dr. Lucking claimed the probability that Defendant could be restored to competency was "substantial."

Dr. Lucking further argued that Mr. Fabela was not likely to suffer any significant side effects from the proposed treatment that would significantly interfere in his ability to assist trial counsel. The side effects of Haldol are well known. Most notably, Haldol

---

[3]The treatment plan involves a dosage of Haloperidol Deconoate (Haldol) of 150 to a maximum of 200 milligrams. The medication will be injected at two-week intervals for the first month (three total times during the first month) and then, every four weeks. The dosage would equate to approximately 5 milligrams per day. Whether to increase the dosage within this range would depend on several factors, including the defendant's response to the medication. If defendant continues to be symptomatic, blood level would be assessed to determine if he was in the adequate therapeutic range. If he was determined to be within an adequate therapeutic range, and if psychotic symptoms were unchanged, the drug would be deemed a failure. This procedure would be followed for four months at which time, a report would be submitted to the Court setting forth the findings.

tends to cause neurological disturbances that manifest as extrapyramidal and tardive symptoms.

Extrapyramidal symptoms include, dystonic reactions, or large muscle group contractions, such as the neck, jaw and back; akathisia, which is a sense of restlessness or fidgeting; and pseudoparkinsonism, Parkinsonism movements such as stiffness, swinging arms, tremor of the hands and decrease in emotional expression. Dr. Lucking described dystonic reactions as akin to a "charley horse" and are "very frightening" and "very painful," but can be treated with a drug known as Cogentin. According to Dr. Lucking, these reactions are, fortunately, extremely rare. Dr. Lucking noted that he sees a reaction like this in less 30% of all patients.

Tardive symptoms are generally associated with long-term use of first-generation antipsychotic medications. If these symptoms appear at all, it is generally three to six years after treatment has begun. According to Dr. Lucking, they are generally not treatable but when medication is discontinued, they sometimes resolve over time. The longevity of these symptoms is described in thirds: a third go away, a third stay the same, a third get worse. The tardive symptoms occur in 2% of persons who are treated with first generation anti-psychotic drugs, but Dr. Lucking noted that he had not seen tardive symptoms occur in any patients that he has treated for competency restoration.[4]

Lastly, responding to fact that Mr. Fabela had been previously treated with antipsychotic medication without apparent success, Dr. Lucking stated that Defendant was non-compliant with previous attempts at voluntary treatment, and those previous attempts are not an accurate indication of how Defendant will responded to a forced treatment plan. Specifically, the United States claims that Dr. Lucking treated Defendant with three different medications, Zipasidone (Geodon), Aripiprazole (Abilify) and

---

[4]There are other miscellaneous side effects related to the administration of Haldol, which was the subject of expert testimony. However, these side effects, such as spontaneous death and Neuroleptic malignant syndrome, do not occur with enough frequency for the Court to give them more than minimal consideration and weight in its analysis.

- 8 -

Risperidone (Risperdal), during the his first stay at the Federal Medical Facility-Buckner. Because Defendant was noncompliant, insisting that the medication be increased, decreased or discontinued, these trials were inadequate. The United States alleged numerous incidents of Defendant's non-compliance, and submitted these incidents to the Court as follows:

- 01/30/2006: Defendant refused to take Ziprasidone.
- 03/08/2006: Intern advised Dr. Lucking that Defendant had not been taking Risperidone for one week and he was going to continue to refuse taking it.
- 03/2006: 13 refusals by Defendant of Risperidone.
- 05/2006: 11 refusals by Defendant of Risperidone.
- 05/2006: Combination of risperidone and carbamezephine were ordered but terminated as they were not successful.
- 11/02/2006: Defendant refused to take Loxapine and said "I'm not taking it anymore."
- 11/30/2006: Defendant discontinued use of medications. Defendant then agreed to take Perhenzine but quickly became non-compliant.
- 12/2006: 13 refusals by defendant of Perphenzine.
- 02/07/2007: Trial of loxapine, thiothixene and perphanazine; Defendant stopped the medication or asked that it be discontinued.
- 06/05/2007: Defendant denied taking medication for several weeks.
- 02/11/2008: Defendant complained that Haldol was sedating him. He requested to be placed on Aripiprazole. Defendant later said that he stopped taking this medication because his uncle's voice (in his head) instructed him not to take it.
- 4/28/08: Aripiprazole was discontinued.

Defendant has taken issue with the government's position regarding voluntary compliance. Defendant claims that the examples of his medication refusal must be viewed in the proper context of his overall treatment program, and its relative lack of success. Defendant also claims that his refusal to take medications related to their side effects, which included increased sedation and sleeping, nightmares, stiffness in the body, and an increased paranoia that was documented by medical staff at the Butner facility. Defendant also claims that—according to the government's own witness—he remained on Risperidone and Carbamezephine from May 2006 until late in that same year, and that the medications were discontinued because of their ineffectiveness, rather than any type of refusal on the part of Mr. Fabela.

Defendant's expert witness, Dr. Rosengard, took issue with many of Dr. Lucking's statements concerning whether the administration of Haldol was substantially likely to

render Mr. Fabela competent to stand trial. Dr. Rosengard noted that despite numerous trials with various types of antipsychotics, Defendant had not demonstrated any benefit from the medications prescribed during the period of voluntary treatment. With respect to the percentage of success cited by the government, Dr. Rosengard contended that these percentages more aptly describe first-time patients with no previous exposure to similar medications; a success rate upwards of 70% did not apply to individuals who had failed voluntary therapy on several occasions or who had a documented increase in paranoid ideation during previous treatment. Dr. Rosengard also noted that Defendant had already been on Haldol (administered orally), experienced side effects on a rather low dose and did not show any clinical benefit. In his opinion, there was little point in subjecting Defendant to prolonged exposure to the same medication.

Regarding the potential side effects of Haldol, Dr. Rosengard noted that the medical records showed that while on Haldol, Defendant complained that the medication was sedating him excessively and interfering with his thinking, he also had complaints of stiffness. Defendant takes issue with Dr. Lucking's claim that extrapyramidal symptoms occur in less than approximately 30% of patients, and that Dr. Lucking had not seen an acute dystonic reaction in a number of years. Defendant notes that within five days of starting Defendant on Haldol, Dr. Lucking prescribed Defendant Cogentin, which is a known treatment for dystonic reactions to Haldol.

With respect to whether the government's proposed treatment plan is substantially likely to render him competent to stand trial, and whether that plan is unlikely to cause side-effects that will interfere with Defendant's ability to help and assist his counsel during trial, the Court finds that this factor weighs heavily in favor of Mr. Fabela, and does not counsel towards the issuance of a Sell order.

As noted above, Mr. Fabela has previously been treated with a variety of antipsychotics, including the oral version of Haldol. None of these medications showed any effectiveness. While the government argued that these previous trials are not an accurate barometer of future success due to Defendant's consistent refusals, the Court

notes that Defendant was treated with several medications, including Haldol, for a long enough period of time to have observed some therapeutic effect. However, the medical record does not support a finding that any of these previous trials had any measurable therapeutic effect on Defendant. Instead, the record is replete with references to side effects, including increased drowsiness and difficulties thinking. Other than Defendant's subjective complaints while undergoing treatment, there is evidence that less than one week after starting a course of Haldol Dr. Lucking prescribed Defendant Cogentin, a medication used to control acute dystonic reactions to antipychotics. This is an inconsistency in Dr. Lucking's testimony that remains unexplained. Furthermore, there is also evidence in the medical records to suggest that Defendant actually became more psychotic while undergoing voluntary pharmacological treatment. In light of the evidence presented to the Court, including the expert testimony of Dr. Lucking and Dr. Rosengard, the Court cannot conclude that the government's treatment plan is "substantially" likely to render Defendant competent for trial.

**C. Medication Is Necessary To Further The Government's Interests**

With respect to whether involuntary medicating Defendant with Haldol would further the government's interests, the United States contends that because Defendant is unlikely to improve in the foreseeable future absent medication of some sort, and because he was non-compliant with previous attempts at medication, forced medication furthers the government's interest in resolving Defendant's criminal charges while also furthering Defendant's interest in receiving proper treatment for his psychotic condition.

On the other hand, Defendant argues that there are less intrusive alternatives still available, and that he is still willing to undergo voluntary treatment if the side effects can be eliminated or controlled. For example, Defendant's expert, Dr. Rosengard, suggested that the drug Clozaril should be prescribed before Haldol is again attempted. According to Dr. Rosengard, Clozaril "is a medication that [is used] when there's failure of other antipsychotic medications." Because Clozaril is administered orally, Dr. Rosengard suggested that it would be less intrusive and cause less discomfort than a deep muscular

injection of Haldol. Dr. Rosengard also claimed that a more effective treatment plan might include using medications that had not been previously prescribed, such as Depakote, Lithium, ETC. Dr. Rosengard stated that if one or a combination of these drugs could effectuate a reduction in psychosis, than Defendant's voluntary compliance with treatment might increase. At the same time, the Court notes that Dr. Lucking disagreed with Dr. Rosengaurd's assessment. Just like any Haldol, or any other antipsychotic medication, Dr. Lucking argued that Clozaril also had undesirable side effects. Furthermore, Dr. Lucking opined that a treatment plan relying on medications that had not been previously administered would be no more likely to succeed than the proposed treatment plan with Haldol.

The Court notes that Defendant failed previous treatments with Haldol. As such, Dr. Rosengaurd's description of Clozaril or other non-utilized medications underscores the Court's concern regarding the proposed treatment plan, and whether it accounts for other reasonable means of treatment other than a <u>Sell</u> Order. Generally, before seeking an Order from this Court under <u>Sell</u>, the government should first attempt to exhaust all other practical voluntary treatment options. The Court is not convinced that such an exhaustive attempt has been made by the FMC in this case.

The Court notes that earlier in the proceedings the Federal Medical Center attempted to secure a <u>Sell</u> Order from this Court before it had even held a <u>Harper</u> hearing—which is a prerequisite for the issuance of a valid <u>Sell</u> Order.[5] This is not the first time that a court within the District of Arizona has been addressed the Federal Medical Center's attempts to inappropriately secure a <u>Sell</u> Order. See <u>United States v. Gonzalez-Aguilar</u>, 446 F. Supp. 2d 1099 (D. Ariz. 2006).

///

---

[5]The Court notes that it was the attorney for the United States, Sharon Sexton, who first notified the Court that the Federal Medical Center had failed to conduct a <u>Harper</u> hearing before requesting a <u>Sell</u> Order.

**D. The Administration Of Medication Is Medically Appropriate**

Defendant's primary mental illness is schizophrenia which results in difficulties with accurately assessing reality. The main symptoms include auditory hallucinations and delusional beliefs. Neither Defendant nor the government that the administration of antipsychotic medications are the accepted medical treatment for individuals afflicted with this illness.

**IV. CONCLUSION**

After carefully weighing the four relevant <u>Sell</u> factors, the Court declines to issue an Order permitting the government to involuntarily medicate Defendant in an attempt to restore his competency.

**Accordingly,**

**IT IS HEREBY ORDERED** denying the United States of America's request to issue an Order pursuant to the <u>United States v. Sell</u>, 539 U.S. 166 (2003).

**IT IS FURTHER ORDERED** setting this matter for Status Hearing on November 2, 2009 at 11:45 a.m.

DATED this 28th day of September, 2009.

_____
Mary H. Murguia
United States District Judge